1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JAMES EDWARD SCOTT, III,

                                    Plaintiff,

    v.

HERZOG, et al.,

                                    Defendants.

Case No. 3:22-cv-00564-ART-CLB

SCREENING ORDER
SECOND AMENDED COMPLAINT
AND RELATED MATTERS

10    *Pro se* Plaintiff James Edward Scott, III, brings this civil-rights lawsuit to
11  redress constitutional violations that he allegedly suffered while he was
12  incarcerated at Northern Nevada Correctional Center ("NNCC"). On June 14,
13  2023, this Court screened Scott's First Amended Complaint, allowing all claims
14  to proceed except the claim under the Fourteenth Amendment's Equal Protection
15  Clause, which the Court dismissed with leave to amend by July 14, 2023. (ECF
16  No. 14). Scott timely filed his Second Amended Complaint ("SAC"). (ECF No. 17).
17  Scott also refiled his unsuccessful motions asking the Court to exempt him from
18  the prison's copy-work limit for the duration of this lawsuit and to compel the
19  NDOC to provide him with a full and complete copy of his grievance records. (ECF
20  Nos. 15, 16).

21    The Court now screen Scott's SAC under 28 U.S.C. § 1915A. Having done
22  so, the Court finds that Scott arguably states colorable claims under the First,
23  Fourth, Eighth, and Fourteenth Amendments; the Americans with Disabilities
24  Act ("ADA"); and the Rehabilitation Act ("RA"), so the Court allows those claims
25  to proceed. The Court refers this matter to the Inmate Early Mediation Program,
26  stays this action for 90 days, denies Scott's motions for a copy-work extension
27  and to produce documents, and again defers ruling on Scott's application to
28  proceed *in forma pauperis*.

1

I.    **SCREENING STANDARD**

Federal courts must conduct a preliminary screening in any case in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). In its review, the Court must identify any cognizable claims and dismiss any claims that are frivolous or malicious, or that fail to state a claim upon which relief may be granted or seek monetary relief from a defendant who is immune from such relief. *See id.* at § 1915A(b)(1)(2). All or part of the complaint may be dismissed *sua sponte* if the prisoner's claims lack an arguable basis in law or fact. This includes claims based on legal conclusions that are untenable, like claims against defendants who are immune from suit or claims of infringement of a legal interest that clearly does not exist, as well as claims based on fanciful factual allegations or fantastic or delusional scenarios. *See Neitzke v. Williams*, 490 U.S. 319, 327–28 (1989); *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

Dismissal for failure to state a claim is proper only if the plaintiff clearly cannot prove any set of facts in support of the claim that would entitle him or her to relief. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). In making this determination, the Court takes all allegations of material fact as true and construes them in the light most favorable to the plaintiff. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a *pro se* complainant are held to less stringent standards than formal pleadings drafted by lawyers, *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *see also Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990) (recognizing that *pro se* pleadings must be liberally construed), but a plaintiff must provide more than mere labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While legal conclusions can provide the framework of a complaint, they must be supported with factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that

2

1  requires the reviewing court to draw on its judicial experience and common

2  sense." *Id.*

## II.  SCREENING OF SAC

### A.  Scott's factual allegations

Scott has end-stage kidney or "renal" disease for which he receives "life-saving dialysis treatment." (ECF No. 17 at 5). Scott receives dialysis through a "perma-catheter that is prone to a high risk of infection and that can't get wet[.]" (*Id.* at 7). Scott's kidney condition causes him to suffer "chronic" exhaustion, fatigue, dizziness, weakness, muscle cramps, light-headedness, itching, sore muscles, hypertension, dehydration, difficulty breathing, edema, cognitive impairment, brain fog and "frequent blackouts, recurring faint[ing] spells, [and] increased heart-attack and stroke risk. (*Id.* at 6). Scott takes medications for his kidney condition that sometimes exacerbate his symptoms. (*Id.*)

Dialysis treatment causes Scott to experience "extremely low blood pressure" and he is at risk of falling because he has "orthostatic hypotension[.]" (*Id.* at 22). All staff at NNCC are aware of Scott's medical conditions and symptoms. (*Id.* at 6–7). Scott requires an ADA-compliant shower to reduce any unnecessary risk of injury from falling. (*Id.* at 7). Thus, Scott is "routinely placed in an ADA shower during shower time, before going to dialysis, and to undergo strip search protocol." (*Id.*)

On April 18, 2022, Corrections Officers Kibble and Omler removed Scott from his cell for his scheduled dialysis treatment by placing him in full wrist restraints and escorting him to an ADA shower to be strip searched. (*Id.* at 6–7). After the strip search was complete, Scott was placed in full body restraints and escorted by Corrections Sergeants Herzog and Fluerher and Corrections Officer Johnson to the infirmary for his dialysis treatment. (*Id.* at 7). Scott was handcuffed to the dialysis chair for the duration of his four-hour dialysis treatment. (*Id.*)

Dialysis treatment "is psychologically, emotionally, and even physically taxing on the body." (*Id.* at 8). Treatment largely drains Scott of a "substantial portion of [his] energy" and "causes [him] extreme muscle cramps, dizziness, light-headedness, muscle soreness, pain, blackouts, fainting, as much as cognitive impairment, brain fog, and substantial weakness, fatigue, exhaustion, and weakness." (*Id.*) Sometimes after treatment, Scott cannot even stand without assistance. (*Id.*)

After the treatment Scott was returned to Herzog, Fluerher, and Johnson's custody to be transported back to his cell. (*Id.*) When the officers arrived, Scott told them that he was lightheaded, dizzy, fatigued, exhausted, weak, and had "extremely painful muscle cramps." (*Id.*) Scott said that he needed to use the toilet and for the officers to use an ADA shower to conduct his strip search. (*Id.*) Herzog responded, "We hear you, Scott. Let's just get you back to the unit first." (*Id.*)

The officers escorted Scott, who was still in full body restraints, to his unit using a State vehicle. (*Id.*) Once they arrived outside Scott's housing unit, Scott reminded the officers that he needed to use the toilet and for them to use an ADA shower for his strip search. (*Id.*) Scott specifically stated that he had not used the toilet since 2:30 p.m., and it was 7:20 p.m. (*Id.*) Herzog responded, "No, you're going to a regular shower (non-ADA without a seat or lean space) and then you can get to your cell and sit down and use the restroom after you do a strip search." (*Id.* at 9).

Although Scott believed that the second strip search was unreasonable, he said "Okay" to the search but demanded an ADA shower where he could sit during the search. (*Id.*) Scott repeated his condition and symptoms necessitating an ADA shower. (*Id.*) Scott informed the officers that he had been injured twice in the past four weeks when he was denied an ADA shower for a strip search after undergoing dialysis treatment. All three officers said "No," and forced Scott into a non-ADA shower. (*Id.*)

When Scott again said that he could not safely comply to the strip search in the non-ADA shower, the officers responded by walking away, laughing, and saying, "Well, it looks like you're going to be in there all night." (*Id.*) Scott made a final attempt to get the officers to conduct the search in an ADA shower, but Herzog responded by "mockingly and sarcastically saying "Bye Scott." (*Id.*) All the officers then left "smirking, smiling, and laughing." (*Id.*)

Despite having no history of institutional violence, Scott is the only inmate who is required to be escorted to and from dialysis treatment by two sergeants and often denied an ADA shower for strip searches. (*Id.* at 10). Scott has dialysis treatment every Monday, Wednesday, and Friday. (*Id.*) Scott was the only inmate who was videotaped by corrections officers when being escorted to dialysis treatment. (*Id.* at 21). Scott was housed in unit 7A and, like all other inmates housed in units 7A and 7B, had a level 4 classification status. (*Id.*) Also like all other inmates housed in units 7A and 7B, Scott is disabled, requires an ADA shower, and undergoes dialysis treatment. (*Id.*)

While Scott was left in the shower, he was forced to squeeze his genitals tightly and clench his anus to stop from urinating and defecating on himself. (*Id.* at 11). At 7:22, 7:55, 8:03, 8:20, 8:50, 9:07, 9:31, 9:40, 10:48, and 11:02 in the evening on April 18, Scott "desperately and repeatedly pleaded with all available staff" to "please let [him] use the restroom," and that he needed an ADA shower. (*Id.*) Miller, Ryer, Craig, Herzog, Fluerher, Sowin, Smith, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Johnson all heard Scott's pleas but did nothing about them. (*Id.*)

The pain became so intense that Scott blacked out. (*Id.* at 11–12). When Scott awoke, he discovered that he had urinated and defecated on himself. (*Id.* at 12). The smell was bad and made Scott want to vomit. (*Id.*) Scott was so weak that he couldn't move, and he called "man down." (*Id.*) This happened at 11:20 p.m. and Scott yelled "man down" for an hour while corrections officers ignored

him. (*Id.*) Eventually, inmate Farrell called a "man down" for himself to help Scott by bringing medical staff to respond to their housing unit. (*Id.*)

When medical staff arrived, rather than enter the housing unit, which is normal procedure, they remained in the "intake holding area" where they "wouldn't have to physically observe [Scott's] medical emergency and could ignore his "man down" calls. (*Id.* at 13). Mr. Farrell was handcuffed and escorted to medical staff in the holding area by Corrections Officer Rose. (*Id.*) Scott yelled and screamed "man down" but Rose ignored him. (*Id.*)

After medical staff finished evaluating and treating Mr. Farrell, he told them that Scott needed emergency medical attention. (*Id.*) Scott finally received medical attention at 12:40 a.m. on April 19. (*Id.*) Nurse Jane Doe asked, "What's your medical emergency, Scott?" (*Id.* at 14). Nurse Jane Doe's tone made it clear that she was frustrated with him. (*Id.*) Scott recounted his condition, symptoms, everything that had happened since dialysis treatment and that he was worried his dialysis catheter site would get infected and he could die from it. (*Id.*) Nurse Jane Doe responded, "Well, what do you want me to do about it?" (*Id.*) Scott responded, "I don't know, you're the nurse. Do whatever you're supposed to do. I have a dialysis perma-catheter which puts me at extremely high risk of infection and there is shit and piss everywhere. You can at least pull me out of this shit and piss and help me into the ADA shower where I can clean off." (*Id.*)

Scott then heard Nurse Jane Doe say to a corrections officer, "Look, all I need to do is check his blood pressure and then I can leave," which she said rudely. (*Id.* at 15). Corrections Officer Ralston said, "Scott, I'm going to need you to try and stand up so that you can submit to belly restraints[.]" (*Id.*) Scott replied, "I can't stand up on my own. I need help. I can't move my legs without intense pain[,] and I don't want to risk falling and causing further injury. I can manage to stick my hands out of the food slot to submit to restraints but that's about it." (*Id.*)

Officers agreed and Scott was handcuffed, using only wrist restraints, to the shower door. (*Id.*) But no one moved to help Scott out of the situation, so he began to pull himself out of the shower using only his arms because his legs didn't work properly. (*Id.*) Corrections Officers Klein, Rose, Collins, Cornell, Ralston, and Herzog forcefully pushed Scott back into the shower. (*Id.* at 16). Scott begged not to be placed back in the shower containing his urine and feces, but he was forced back in, retaining scrapes and bruises on his left arm and "significant damage to [his] right leg (knee area)" in the process. (*Id.*) Nurse Jane Doe then said, "You don't need medical attention. If you did then you wouldn't act like that," and she left the housing unit. (*Id.*) A corrections officer then said, "Stop your fake crying, Scott." (*Id.*) Scott continued crying. (*Id.* at 17).

Scott was in the shower covered in his own urine and feces for over 12 hours. (*Id.*) At 8:00 a.m. on April 19, 2022, Corrections Officer Santos helped Scott into the ADA shower to clean himself. (*Id.*) Scott then had a medical exam and was interviewed by Sergeant Walker and his injuries were photographed by Corrections Officer Hicks. (*Id.* at 17–18). Scott was escorted to the infirmary. (*Id.* at 18). Under "false" claims that Scott had failed the psychological evaluation, he was told that he would be moved into the infirmary for observation. (*Id.*) Scott, however, was "determined and intent on hiding the true extent of [his] psychological and emotional injuries [that he] just focused on entertaining the panel members and despite [his] feeling of dissociation and out-of-bodyness," succeeded in passing the evaluation "with flying colors." (*Id.* at 19). Scott was rehoused in his original cell. (*Id.* at 18). Scott purposefully passed the psychological exam so he wouldn't be forcibly medicated or removed from inmates who witnessed what happened. (*Id.* at 18–19).

After Scott was returned to his cell, he covered his cell window, got "under the covers and cried the heavy and relentless tears of a man who has been wounded beyond reason." (*Id.* at 19). When Scott awoke the next morning, he

broke down in tears again. (*Id.*) That same day—April 20, 2022—Scott again had dialysis and Sergeant Smith denied Scott a "readily available state vehicle" to transport him back to his housing unit despite constant complaints about his "exhaustion, fatigue, light-headedness, difficulty breathing, and feeling as if [he] was going to faint." (*Id.* at 19–20). When Scott returned to the unit, he was again denied an ADA shower for the strip search by Sergeant Smith. (*Id.* at 20). Corrections Officers Ruelas, Sheeks, Jacobs, and Johnson helped Scott during the search. (*Id.*)

On April 22, 2022, at 5:20 a.m., Corrections Officer Kibble prepared Scott for dialysis by providing him an ADA shower for his strip search. (*Id.*) Kibble recorded the dialysis treatment on a hand-held camera. (*Id.*) After treatment, Scott was moved to another housing unit "in retaliation and to separate [Scott] from [his] witnesses in unit 7A." (*Id.*) The inmates surrounding Scott's new cell are all White and members of a racist gang that is antagonistic toward Black inmates like Scott. (*Id.*) Scott is constantly exposed to racial epithets in his new housing unit because he is Black. (*Id.*)

**B.    Scott's claims**

Based on these allegations, Scott contends that Defendants violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments; the ADA, and the RA. (*Id.* at 2). He sues Herzog, Fluerher, Craig, Smith, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, Aguiano, Johnson, and Nurse Jane Doe. (*Id.* at 1–4). Scott seeks declaratory, injunctive, and monetary relief. (*Id.* at 24). The Court liberally construes the SAC as bringing claims based on seven different theories of liability: (1) First Amendment retaliation; (2) Fourth Amendment excessive strip searches, (3) Eighth Amendment indifference to serious medical needs, (4) Eighth Amendment indifference to unsanitary conditions of confinement, (5) Eighth Amendment excessive force, (6) Fourteenth Amendment Equal Protection Clause violations, and (7) failure to provide

reasonable accommodations under the ADA and RA. The Court addresses each theory and any issues below.

### C.   Analysis of claims

#### 1.   Scott states a colorable First Amendment retaliation claim.

Prisoners have a First Amendment right to file prison grievances and pursue civil-rights litigation in the courts, "and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004). A retaliation claim in the prison context has five elements. *Watison*, 668 F.3d at 1114. "First, the plaintiff must allege that the retaliated-against conduct is protected." *Id.* Filing or submitting a grievance, complaint, or lawsuit about prison conditions or alleged constitutional violations is protected conduct. *Entler v. Gregorie*, 872 F.3d at 1031, 1039 (9th Cir. 2017). The form that a prisoner's complaint takes—"even if verbal"—"is of no constitutional significance, and threats to sue fall within the purview of the constitutionally protected right to file grievances." *Id.*

Second, the plaintiff must allege that "the defendant took adverse action against [him]." *Watison*, 668 F.3d at 1114. "'The mere threat of harm can be an adverse action.'" *Id.* (brackets and emphasis omitted) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009)). The third factor requires the plaintiff to "allege a causal connection between the adverse action and the protected conduct." *Id.* Allegations "of a chronology of events from which retaliation can be inferred is sufficient" at the screening stage. *Id.*

"Fourth, the plaintiff must allege that the 'official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* (quoting *Robinson*, 408 F.3d at 568). "A plaintiff who fails to allege a chilling effect may still state a claim if he alleges [that] he suffered some other harm that is more than minimal." *Id.* (brackets and quotation marks omitted) (quoting

1    *Brodheim*, 584 F.3d at 1269 and *Robinson*, 408 F.3d at 568 n.11). The fact "[t]hat

2    the retaliatory conduct did not chill the plaintiff from suing the alleged retaliator

3    does not defeat the retaliation claim" at the pleading stage. *Id.*

4    And the fifth factor requires the plaintiff to allege "'that the prison

5    authorities' retaliatory action did not advance legitimate goals of the correctional

6    institution.'" *Id.* (quoting *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)). A

7    plaintiff can sufficiently plead "this element by alleging, in addition to a retaliatory

8    motive, that the defendant's actions were arbitrary or capricious, or that they

9    were unnecessary to the maintenance of order in the institution." *Id.* (internal

10   quotation omitted).

11   Based on the allegations, Scott was moved to a different housing unit after

12   the events of April 18 and 19, 2022, which included him calling "man down" for

13   an hour and another inmate calling "man down" largely to get him medical

14   attention. Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble,

15   Rose, Omler, Cornell, Ralston, Klein, Aguiano, and Nurse Jane Doe ignored

16   Scott's cries for help, which resulted in him being "falsely" reported for a mental

17   health observation and threatened with a housing change. The threatened

18   housing reassignment was cancelled after Scott convinced mental-health

19   examiners that he was mentally fit when he wasn't. But Scott was moved to a

20   different housing unit days later after prison staff again denied him an ADA

21   shower for his post-dialysis strip search and refused to use a vehicle to transport

22   him back to the housing unit after his treatment. Scott alleges that because of

23   the move, he was separated from witnesses to the events of April 18 and 19 and

24   is now surrounded by White members of a racist gang who constantly use racial

25   epithets against him because he is Black.

26   The Court finds that these allegations are enough for screening purposes

27   to arguably state that Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer,

28   Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, Aguiano, and Nurse Jane

Doe retaliated against Scott for his verbal grievances about his medical and disability needs not being met by causing him to be moved to a different housing unit, and that the move caused Scott to suffer harm that is more than minimal. The First Amendment retaliation claim can therefore proceed against Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano now, and this claim can proceed against Nurse Jane Doe when Scott learns her name and obtains leave of court to substitute her as a defendant.

**2.      Scott states a colorable Fourth Amendment claim about unreasonable strip searches.**

Generally, strip searches do not violate the Fourth Amendment rights of prisoners. *See Michenfelder v. Sumner*, 860 F.2d 328, 332–33 (9th Cir. 1988). However, strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest" may be unconstitutional. *Id.* at 332. In other words, although both convicted prisoners and pretrial detainees retain some Fourth Amendment rights upon commitment to a corrections facility, the Fourth Amendment prohibits only unreasonable searches. *Bell v. Wolfish*, 441 U.S. 520, 558 (1979).

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* at 559. In each case, a court must (1) balance the need for the search against the invasion of personal rights that the search entails and (2) consider the scope of the intrusion, the way the search is conducted, the justification for initiating the search, and the place in which the search is conducted. *Id.* Courts also consider the existence of a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the existence of obvious, easy

alternatives" as evidence that the regulation "is an 'exaggerated response' to prison concerns." *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 973 (9th Cir. 2010) (*citing Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

Based on the allegations, Scott is strip searched every time he goes to the infirmary for his dialysis treatment, which happens three times a week. He is always escorted to the infirmary by two corrections officers, who are usually sergeant rank, and placed in full body restraints for the trip. During dialysis treatment, which lasts four hours and is sometimes done with other inmates receiving the same treatment, Scott is handcuffed to the dialysis chair and prevented from moving around. After dialysis treatment, Scott is strip searched before being returned to his housing unit. Scott does not have any history of violent behavior in prison. Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano are responsible for transporting Scott to and from his dialysis treatment.

The Court finds that these allegations are enough for screening purposes to arguably state a Fourth Amendment claim that the dialysis-treatment strip searches are unreasonable. The Fourth Amendment claim about unreasonable strip searches can therefore proceed against Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano.

> **3.   Scott states a colorable Eighth Amendment claim about indifference to the need to sterilize his perma-catheter site and receive medical attention for his injuries.**

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough

to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014).

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted). To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (internal quotations omitted). When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further injury. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference").

Based on the allegations, Scott has end-stage kidney failure for which he receives dialysis treatment through a "perma-catheter." The site for Scott's catheter is prone to infection and cannot get wet. Scott can die if he gets an infection. On April 18, 2022, Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, Aguiano, and Nurse Jane Doe left Scott to sit in a shower for over 12 hours covered in his own urine and feces despite his repeated pleas that he needed an ADA shower to clean himself and could not risk infecting his catheter site because it could result in his death. Nurse Jane Doe refused to evaluate Scott's medical needs despite him telling her about his condition, symptoms, unsanitary conditions of the shower, and that he

suffered injuries when corrections officers forced him back into the shower after handcuffing him to the shower door.

The Court finds that these allegations are enough for screening purposes to arguably state a colorable claim that Defendants were indifferent to Scott's serious medical need to clean himself and for medical analysis and treatment for the injuries he sustained when corrections officers allegedly forcibly pushed him back into the soiled shower. The Eighth Amendment claims about indifference to Scott's medical needs to sanitize his catheter site and receive medical attention for his injuries can therefore proceed against Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano now, and this claim can proceed against Nurse Jane Doe when Scott learns her true name and obtains leave of court to substitute her as a defendant.

### 4. Scott states a colorable Eighth Amendment claim about unsanitary conditions of confinement.

The "treatment a prisoner receives in prison and the conditions under which [he or she] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Conditions of confinement may, consistent with the Constitution, be restrictive and harsh. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). But "[p]rison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "To establish an Eighth Amendment violation, a prisoner must satisfy both the objective and subjective components of a two-part test." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotation omitted).

In determining whether the alleged condition satisfies the objective prong of the Eighth Amendment analysis, the court must analyze each condition separately to verify if it violates the Eighth Amendment. *See Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir. 1981). "[T]he deprivation alleged must be,

14

objectively, sufficiently serious" and "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (internal quotations and citations omitted). And the court should consider the amount of time that the prisoner was subjected to the condition. *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005).

To satisfy the subjective prong of the Eighth Amendment analysis, a prisoner must show that a prison official acted with "deliberate indifference" to the condition of confinement. *Id.* To adequately plead deliberate indifference, a prisoner must show that a prison official was subjectively reckless. *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015). This entails showing that the prison "'official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). "Constructive notice does not suffice to provide the requisite knowledge, but '[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including from circumstantial evidence.'" *Id.* (quoting *Farmer*, 511 U.S. at 841–42).

Based on the allegations, after a four-hour dialysis treatment on April 18, 2022, Scott repeatedly asked Herzog and Fluerher if he could use the toilet. Herzog and Fluerher told Scott he'd have to wait until he was back in his cell. When they returned to the housing unit, Scott again asked to use the toilet and pleaded with Herzog and Fluerher to use an ADA shower for his post-treatment strip search. Herzog and Fluerher refused, forced Scott into a non-ADA shower, and left him there for at least four hours. Scott passed out from pain and urinated and defecated on himself. Scott yelled "man down" for an hour but was ignored. Nurse Jane Doe and corrections officers eventually responded, but did nothing to alleviate the unsanitary conditions in the shower. Scott did not receive access

to and ADA shower and ability to clean himself until 8:00 the next morning. Defendants Miller, Ryer, Craig, Herzog, Fluerher, Sowin, Smith, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Nurse Jane Doe all heard that Scott was trapped in the shower, covered in urine and feces, and unable to clean himself due to weakness, but they did nothing to help him.

The Court finds that these allegations are enough for screening purposes to arguably state a colorable claim that Scott was exposed to unsanitary conditions that were severe or prolonged, and Miller, Ryer, Craig, Herzog, Fluerher, Sowin, Smith, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Nurse Jane Doe were indifferent to the threat those conditions posed to Scott's health. The Eighth Amendment claim about unsanitary prison conditions can therefore proceed against Miller, Ryer, Craig, Herzog, Fluerher, Sowin, Smith, Kibble, Rose, Omler, Cornell, Ralston, and Klein now, and this claim can proceed against Nurse Jane Doe when Scott learns her true name and obtains leave of court to substitute her as a defendant.

### 5. Scott states a colorable Eighth Amendment claim about use of excessive force.

When a prison official is accused of using excessive physical force in violation of the cruel and unusual punishment clause of the Eighth Amendment, the question turns on whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In determining whether the use of force was wanton and unnecessary, it may also be proper to consider factors like the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Id.* at 7. Although an inmate need not have suffered serious injury to bring an excessive force claim against a

1    prison official, the Eighth Amendment's prohibition on cruel and unusual
2    punishments necessarily excludes from constitutional recognition *de minimis*
3    uses of physical force. *Id.* at 9–10.

4         Based on the allegations, after Scott had been left in the shower for over
5    four hours, passed out from pain, and defecated and urinated on himself, he told
6    Defendants that he could not stand on his own accord and needed help getting
7    out of the shower. Corrections officers handcuffed Scott to the shower door but
8    did not help him move, so Scott started to pull himself out of the soiled shower
9    by his arms. But Klein, Rose, Collins, Cornell, Ralston, and Herzog forcefully
10    pushed Scott back into the shower. As a result, Scott sustained scrapes and
11    bruises on his left arm and "significant damage " to his right knee.

12         The Court finds that these allegations are enough for screening purposes
13    to arguably state a colorable claim that Defendants used a not *de minimis* amount
14    of force when putting Scott back into the shower, and the force was not applied
15    in a good-faith effort to maintain or restore discipline. The Eighth Amendment
16    excessive-force claim can therefore proceed against Klein, Rose, Collins, Cornell,
17    Ralston, and Herzog.

18         **6.    Scott states a colorable class-of-one claim under the Fourteenth Amendment's Equal Protection Clause.**
19

20         The Equal Protection Clause of the Fourteenth Amendment is essentially a
21    direction that all similarly situated persons be treated equally under the law. *City
22    of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an
23    equal protection claim, a plaintiff must allege facts demonstrating that
24    defendants acted with the intent and purpose to discriminate against him or her
25    based upon membership in a protected class, or that defendants purposefully
26    treated him or her differently than similarly situated individuals without any
27    rational basis for the disparate treatment. *Lee v. City of Los Angeles*, 250 F.3d
28    668, 686 (9th Cir. 2001); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000). The Equal Protection Clause protects prisoners "from invidious discrimination based on race," intentional discrimination based on religion, as well as disparate treatment based on sexual orientation or gender. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974); *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008); *United States v. Windsor*, 570 U.S. 744, 769–70 (2013); *Harrison v. Kernan*, 971 F.3d 1069, 1075–76 (9th Cir. 2020). And as the Ninth Circuit explained in *SmileDirectClub, LLC v. Tippins*, "a class-of-one plaintiff must be similarly situated to the proposed comparator in all material respects." 31 F.4th 1110, 1123 (9th Cir. 2022).

Based on the allegations, among inmates at NNCC who are disabled and receive dialysis treatment, Scott is the only one who is escorted to dialysis treatment with two corrections officers, who are usually sergeant rank. He is often denied access to an ADA shower for strip searches, and is uniquely strip searched a second time after dialysis. Scott was the only inmate who was videotaped by corrections officers when being escorted to dialysis treatment. Scott was housed in unit 7A and, like all other inmates housed in units 7A and 7B, had a level 4 classification status. Also like all other inmates housed in units 7A and 7B, Scott is disabled, requires an ADA shower, and undergoes dialysis treatment. He's the only inmate without a history of institutional violence who is treated this way.

Scott arguably states a colorable claim that corrections officers purposefully single him out for more onerous security measures for associated with his dialysis treatment, including an additional strip search after treatment, without a rational basis for the disparate treatment. No other similarly situated inmate who receives dialysis treatment is subjected to the same security measures as Scott. Scott alleges that Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano are responsible for transporting him to and from dialysis treatment. The Fourteenth Amendment

Equal Protection Clause claim can proceed against Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano.

**7.    Scott states a colorable claim under the ADA and RA about failure to provide reasonable accommodations for strip searches and dialysis transportation.**

Both the ADA and the RA apply in the prison context. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The RA similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A prisoner states a colorable claim under both the ADA and RA if he alleges that he was "improperly excluded from participation in, and denied the benefits of, a prison service, program, or activity on the basis of his physical handicap." *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997).

Although the ADA does not expressly provide for reasonable accommodations, the implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity[.]" 28 C.F.R. § 35.130(b)(7)(i). The Supreme Court has held that a prisoner may state an ADA claim based on the "alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene,

medical care, and virtually all other prison programs." *United States v. Georgia*, 546 U.S. 151, 157 (2006). Courts apply the same analysis to claims brought under the ADA and RA. *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). But the RA is "limited to programs that receive federal financial assistance." *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013) (cleaned up) (internal quotation omitted).

Additionally, a plaintiff cannot proceed against a prison official in his or her individual capacity on a claim under § 1983 based on the official's "alleged violation of Title II of the ADA and section 504 of the [RA]." *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002). Thus, the proper defendant in an action under the ADA and RA is a prison official in his or her official capacity[1] or the public entity responsible for the alleged discrimination. *See United States v. Georgia*, 546 U.S. 151, 153–54 (2006).

Based on the allegations, Scott has end-stage kidney failure for which he receives dialysis treatment three times a week and takes medications. Scott's condition and treatments render him physically and mentally fatigued and in pain. Scott is strip searched before going to the infirmary for his dialysis treatment and upon returning to his housing unit after treatment. The treatment lasts four hours and is mentally and physically exhausting.

When Scott returned from dialysis treatment on April 18, 2022, he asked Defendants Herzog and Fluerher to provide him with an ADA shower for a strip search and, later, to clean himself. Defendants denied Scott's requests and left him in the shower, covered in his own urine and feces, for over 12 hours because he insisted that he was too weak to hold himself up in a non-ADA shower for a strip search. An ADA shower was available for Scott to use during this time. And

---

[1] "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).

Smith refused to escort Scott back to his housing unit using an available State vehicle after his dialysis treatment on April 20, 2022. Scott was exhausted and sat to rest many times during the walk to his housing unit.

The Court finds that these allegations are enough for screening purposes to arguably state colorable claims under the ADA and RA that Scott is a qualified individual with a disability who sought reasonable accommodations of access to an ADA shower for strip searches and to be transported back to his housing unit after dialysis treatment. The claims under the ADA and RA can therefore proceed against Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano only in their official capacities.

## III.    MOTIONS FOR RELIEF

Scott refiled his motion asking the Court to suspend his copy-work limit for the duration of this lawsuit, arguing that he has 2,500 pages of medical documents that must be copied and provided to the parties, and he will be unable to adequately address "each of the 60 Defendants" discovery requests in this action. (*Compare* ECF No. 15, *with* ECF No. 11). Scott also refiles his motion asking the Court to compel the NDOC to produce all kites, grievances, and administrative appeals that he filed, and any responses to those filings. (*Compare* ECF No. 16, *with* ECF No. 12). As the Court explained when it denied Scott's original motions for this relief, an inmate has no constitutional right to free photocopying. *Johnson v. Moore*, 948 F.2d 517, 521 (9th Cir. 1991). NDOC administrative regulation 722.01(7)(E) provides that inmates "can only accrue a maximum of $100 debt for copy work expenses for all cases, not per case." Courts in this district have found that they can order a prison to provide limited photocopying when it is necessary for an inmate to provide copies to the court and other parties. *See Allen v. Clark Cnty. Det. Ctr.*, 2:10-cv-00857-RLH, 2011 WL 886343, *2 (D. Nev. Mar. 11, 2011).

This case is still in the screening stage. The Court has permitted Scott's claims to proceed, and it will refer this action to the Court's Inmate Early Mediation Program and stay it for 90 days to allow the parties time to settle their dispute. But the Court has not yet ordered that any Defendant can be served with process under Federal Rule of Civil Procedure 4. Nor has the Court entered an order setting a discovery schedule. And there are no pending motions.

Scott, therefore, does not need to provide the Court or any party copies of any document, and no party can or has requested that he produce any documents currently. Moreover, Scott has not shown that he needs expedited discovery for any matter that is currently before the Court in this action. The Court therefore denies Scott's motions to extend copy-work limit and to produce documents without prejudice as premature.

## IV.    CONCLUSION

It is therefore ordered that a decision on the application to proceed *in forma pauperis* (ECF No. 7) is deferred.

It is further ordered that the motions to suspend copy-work limit and to produce documents (ECF Nos. 15, 16) are denied without prejudice as premature.

It is further ordered that the First Amendment retaliation claim can proceed against Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano now, and this claim can proceed against Nurse Jane Doe when Scott learns her true name and obtains leave to substitute her as a defendant.

It is further ordered that the Fourth Amendment claim about unreasonable strip searches can proceed against Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano.

It is further ordered that the Eighth Amendment medical-needs claims about sanitizing the catheter site and injuries sustained in the non-ADA shower can proceed against Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer,

Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano now, and this claim can proceed against Nurse Jane Doe when Scott learns her true name and obtains leave to substitute her as a defendant.

It is further ordered that the Eighth Amendment claim about unsanitary prison conditions can proceed against Defendants Miller, Ryer, Craig, Herzog, Fluerher, Sowin, Smith, Kibble, Rose, Omler, Cornell, Ralston, and Klein now, and this claim can proceed against Nurse Jane Doe when Scott learns her true name and obtains leave to substitute her as a defendant.

It is further ordered that the Eighth Amendment excessive-force claim can proceed against Defendants Klein, Rose, Collins, Cornell, Ralston, and Herzog.

It is further ordered that the Fourteenth Amendment Equal Protection Clause claim can proceed against Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano.

It is further ordered that the claims under the ADA and RA can proceed against Defendants Herzog, Fluerher, Smith, Craig, Miller, Ryer, Sowin, Kibble, Rose, Omler, Cornell, Ralston, Klein, and Aguiano only in their official capacities.

It is further ordered that, given the nature of the claims that the Court has permitted to proceed, this action is stayed for 90 days to allow Scott and Defendants an opportunity to settle their dispute before the $350 filing fee is paid, an answer is filed, or the discovery process begins. During this 90-day stay period and until the Court lifts the stay, no other pleadings or papers may be filed in this case, and the parties may not engage in any discovery, nor are the parties required to respond to any paper filed in violation of the stay unless specifically ordered by the court to do so. The Court will refer this case to the Court's Inmate Early Mediation Program, and the Court will enter a subsequent order about that matter. Regardless, on or before 90 days from the date this order is entered, the Office of the Attorney General must file the report form attached to this order regarding the results of the 90-day stay, even if a stipulation for dismissal is

1   entered before the end of the 90-day stay. If the parties proceed with this action,

2   the Court will then issue an order setting a date for Defendants to file an answer

3   or other response. Following the filing of an answer, the Court will issue a

4   scheduling order setting discovery and dispositive motion deadlines.

5       "Settlement" may or may not include payment of money damages. It also

6   may or may not include an agreement to resolve Scott's issues differently. A

7   compromise agreement is one in which neither party is completely satisfied with

8   the result, but both have given something up and both have obtained something

9   in return.

10      It is further ordered that if the case does not settle, Scott will be required

11  to pay the full $350 statutory filing fee for a civil action. This fee cannot be waived,

12  and the fee cannot be refunded once the Court enters an order granting Scott's

13  application to proceed *in forma pauperis*. If Scott is allowed to proceed *in forma*

14  *pauperis*, the fee will be paid in installments from his prison trust account. *See*

15  28 U.S.C. § 1915(b). If Scott is not allowed to proceed *in forma pauperis*, the full

16  $350 statutory filing fee for a civil action plus the $52 administrative filing fee,

17  for a total of $402, will be due immediately.

18      It is further ordered that if any party seeks to have this case excluded from

19  the mediation program, that party must file a "motion to exclude case from

20  mediation" no later than 21 days before the date set for mediation. The

21  responding party will have seven days to file a response. No reply may be filed.

22  Thereafter, the Court will issue an order, set the matter for hearing, or both.

23      It is further ordered that if Scott needs an interpreter to participate in the

24  mediation program, Scott will file a notice identifying the interpretation language

25  and the need for the interpreter within 30 days from the date of this order.

26      It is further ordered that the Attorney General's Office must advise the

27  Court within 21 days of the date of the entry of this order whether it will enter a

28  limited notice of appearance on behalf of the Interested Party identified below for

24

the purpose of participating in the mediation program. No defenses or objections, including lack of service, will be waived because of the filing of the limited notice of appearance.

The Clerk of Court is directed to: (1) send Plaintiff Scott a courtesy copy of the Second Amended Complaint (ECF No. 17); (2) add the Nevada Department of Corrections to the docket as an Interested Party; and (3) electronically serve a copy of this order and a copy of the Second Amended Complaint (ECF No. 17) on the Office of the Attorney General of the State of Nevada by adding the Attorney General of the State of Nevada to the Interested Party on the docket. This does not indicate acceptance of service.

DATED THIS 20th day of December 2023.


_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF NEVADA

3

4  JAMES EDWARD SCOTT, III,                    Case No. 3:22-cv-00564-ART-CLB

5                    Plaintiff,                REPORT OF ATTORNEY GENERAL
                                               RE: RESULTS OF 90-DAY STAY
6        v.

7  HERZOG, et al.,

8                    Defendants.

9
   **NOTE: ONLY THE OFFICE OF THE ATTORNEY GENERAL WILL FILE THIS
10 FORM.  THE INMATE PLAINTIFF MAY NOT FILE THIS FORM.**

11      On _____, the Court issued its screening order stating that it

12 had conducted its screening pursuant to 28 U.S.C. § 1915A, and that certain

13 specified claims in this case would proceed. The Court ordered the Office of the

14 Attorney General of the State of Nevada to file a report 90 days after the date of

15 the entry of the Court's screening order to indicate the status of the case at the

16 end of the 90-day stay. By filing this form, the Attorney General hereby complies.
                              **REPORT FORM**
17 [Identify which of the following two situations (identified in bold type) describes
   the case, and follow the instructions corresponding to the proper statement.]
18

19 **Situation One: Mediated Case**: **The case was assigned to mediation by a
   court-appointed mediator during the 90-day stay.**  [If this statement is
   accurate, check **ONE** of the six statements below and fill in any additional
20 information as required, then proceed to the signature block.]

21      ____  A mediation session with a court-appointed mediator was held on

22 _____, and as of this date, the parties have reached a settlement
   (*even if paperwork to memorialize the settlement remains to be completed*).
23 (*If this box is checked, the parties are on notice that they must SEPARATELY
   file either a contemporaneous stipulation of dismissal or a motion requesting
24 that the Court continue the stay in the case until a specified date upon which
   they will file a stipulation of dismissal.*)

25      ____  A mediation session with a court-appointed mediator was held on

26 _____, and as of this date, the parties have not reached a
   settlement. The Attorney General therefore informs the Court of its intent
27 to proceed with this action.

28      ____  No mediation session with a court-appointed mediator was held
   during the 90-day stay, but the parties have nevertheless settled the case.

1

*(If this box is checked, the parties are on notice that they must SEPARATELY file a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.)*

____   No mediation session with a court-appointed mediator was held during the 90-day stay, but one is currently scheduled for _____.

____   No mediation session with a court-appointed mediator was held during the 90-day stay, and as of this date, no date certain has been scheduled for such a session.

____   None of the above five statements describes the status of this case. Contemporaneously with the filing of this report, the Attorney General is filing a separate document detailing the status of this case.

**<u>Situation Two: Informal Settlement Discussions Case</u>: The case was NOT assigned to mediation with a court-appointed mediator during the 90-day stay; rather, the parties were encouraged to engage in informal settlement negotiations.** [If this statement is accurate, check **<u>ONE</u>** of the four statements below and fill in any additional information as required, then proceed to the signature block.]

____   The parties engaged in settlement discussions and reached a settlement (*even if the paperwork to memorialize the settlement remains to be completed*).  (*If this box is checked, the parties are on notice that they must SEPARATELY file either a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.*)

____   The parties have engaged in settlement discussions but not reached a settlement. The Attorney General therefore informs the Court of its intent to proceed with this action.

____   The parties have neither engaged in settlement discussions nor reached a settlement. The Attorney General therefore informs the Court of its intent to proceed with this action.

____   None of the above three statements fully describes the status of this case. Contemporaneously with the filing of this report, the Attorney General is filing a separate document detailing the status of this case.

Date:_____

_____
Signature of attorney

_____
Printed name

_____
Address

_____   _____
Telephone number                              Email address

2